UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PATRICK J. MULLANEY ,

        Plaintiff,

        v.

THE PAUL REVERE LIFE INSURANCE
COMPANY and ; UNUM LIFE INSRUANCE
COMPANY OF AMERICA ,

        Defendants.

CASE NO. CV16-263RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the Court on the parties' Motions for Judgment on the Administrative Record.  Dkt. ## 21, 22, 30, 31.  The Motions are opposed.  Dkt. ## 39, 42.

Plaintiff seeks review of Defendants' denial of disability benefits under a group insurance policy and an individual insurance policy, both governed by the Employment Retirement Security Act of 1974 (ERISA) and administered by Defendants.  Dkt. # 1

(Complaint). Plaintiff also seeks declaratory judgment to enforce Defendants' continuing obligation to him under his policies as well as attorney's fees and costs. *Id.*


## II.     PROCEDURAL ISSUES

Before turning to the merits of the parties' arguments, the Court must determine whether it is appropriate to resolve this case on the parties' motions for judgment under Rule 52 as opposed to summary judgment under Rule 56. The answer depends on what standard of review the Court applies. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989) ("ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations."). The parties here have simplified the matter by agreeing that the Court should review Defendants' denial of coverage *de novo*. Dkt. ## 25 at pp. 18-19; 37 at p. 27. The Court accepts the parties' agreement and reviews the record *de novo*. *See Rorabaugh v. Cont'l Cas. Co.*, 321 F. App'x 708, 709 (9th Cir. 2009) (unpublished) (court may accept parties' stipulation to *de novo* review).

Where review is under the *de novo* standard, the Ninth Circuit has not definitively stated the appropriate vehicle for resolution of an ERISA benefits claim. The *de novo* standard requires the Court to make findings of fact and weigh the evidence. *See Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1069 (9th Cir. 1999) (*de novo* review applies to plan administrator's factual findings as well as plan interpretation). Typically, a request to reach judgment prior to trial would be made under a Rule 56 motion for summary judgment, however under such a motion the Court is forbidden to make factual findings or weigh evidence. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Instead, the parties here propose that the Court essentially conduct a bench trial on the administrative record under Rule 52.

This procedure is outlined in *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (noting that "the district court may try the case on the record that the administrator had before it"). In a trial on the administrative record:

> The district judge will be asking a different question as he reads the evidence, not whether there is a genuine issue of material fact, but instead whether [the plaintiff] is disabled within the terms of the policy. In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.

*Id.* Thus, when applying the *de novo* standard in an ERISA benefits case, a trial on the administrative record, which permits the Court to make factual findings, evaluate credibility, and weigh evidence, appears to be the appropriate proceeding to resolve the dispute. *See Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) (on *de novo* review of an ERISA benefits claim, the "appropriate proceeding[] . . . is a bench trial and not the disposition of a summary judgment motion"); *Lee v. Kaiser Found. Health Plan Long Term Disability Plan*, 812 F. Supp. 2d 1027, 1032 n.2 (N.D. Cal. 2011) ("*De novo* review on ERISA benefits claims is typically conducted as a bench trial under Rule 52"); *but see Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005) ("When there is no dispute over plan interpretation, the use of summary judgment . . . is proper regardless of whether our review of the ERISA decision maker's decision is *de novo* or deferential.").

Given the above law and the consensus among the parties, the Court elects to resolve the parties' dispute on the administrative record rather than on summary judgment. Therefore, the Court issues the following findings and conclusions, pursuant to Rule 52.

A. Motion to Strike

As a preliminary matter, Defendants move to strike Exhibits 1 and 2 to Mr. Langer's Declaration (Dkt. ## 49, 50), Plaintiff's Declaration (Dkt. # 44), Mr. Osborn's Declaration (Dkt. # 45), and a physical capacity report issued by Theodore J. Becker,

Ph.D (Dkt. # 23). These materials were not part of the administrative record. When reviewing a plan administrator's decision *de novo*, "new evidence may be considered under certain circumstances to enable the full exercise of informed and independent judgment." *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 943 (9th Cir. 1995). It is within the district court's discretion to allow evidence that was not before the plan administrator. However, such discretion should only be exercised when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision. *Id.* "[A] district court should not take additional evidence merely because someone at a later time comes up with new evidence that was not presented to the plan administrator." *Id.* at 944.

Exhibits 1 and 2 to Mr. Langer's Declaration are Plaintiff's medical records from the University of Washington's Chronic Fatigue Clinic at Harborview Medical Center. Plaintiff argues that these exhibits should be admitted because Defendants argue that Plaintiff was not diagnosed with fibromyalgia until 2014 and these documents are relevant to refute this argument. Defendants contend that such evidence is unnecessary because they acknowledge that Plaintiff was "tentatively diagnosed" with fibromyalgia in 2011. However, Defendants make the argument in both their Motion and Response that Plaintiff cannot support his contention that he was "residually disabled" because he "has not always met the diagnostic criteria" for fibromyalgia. Dkt. # 30 at 18; Dkt. # 39 at 5. First noting that "FMS was initially raised as a possible diagnosis" in September 2011, Defendants argue that "the evidence does not support the conclusion that [Plaintiff] had FMS throughout 2011 based on the absence of 'trigger points' – whose presence are required to establish the FMS diagnosis." The Court disagrees that additional evidence on this issue would be cumulative or unnecessary as Defendants clearly question whether Plaintiff suffered from fibromyalgia in 2011. Where additional evidence is necessary to assist in the understanding of a "complex medical issue," such as the diagnosis of a condition has largely subjective symptoms, the circumstances warrant admission of such

evidence. *See Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007). Therefore, Exhibits 1 and 2 will be considered for the purposes of these Motions.

Plaintiff argues that his Declaration should be admitted because "it corrects the record" with regards to the "nature and character of Plaintiff's physical activities." Plaintiff's contention is that the record contains errors regarding these activities. However, his Declaration appears to be responsive to Defendants' characterization of those physical activities and not a correction of the record itself. Plaintiff makes no persuasive argument that the descriptions of his physical activities during the time period in question in the record are inaccurate, or that these circumstances qualify as "exceptional" such that introduction of Plaintiff's Declaration would be necessary. Defendants' Motion to Strike Plaintiff's Declaration is **GRANTED**. Dkt. # 44.

Plaintiff submits Mr. Osborn's Declaration to clarify the compensation system at Foster Pepper PLLC ("Foster Pepper"), the law firm where Plaintiff works. Plaintiff states that the data in the Declaration is included in the claim file and that the Declaration is "merely added to the record to ease understanding" of Foster Pepper's payment scheme. Clarification of data that is already in the record is not evidence necessary to conduct an adequate *de novo* review of the benefit decision. Further, Plaintiff's assertion mischaracterizes Mr. Osborn's Declaration. The administrative record in this case only includes data from 2011-2013. LTD-310. Therefore, Mr. Osborn's Declaration cannot be a clarification of data that is already contained within Plaintiff's claim file. Mr. Osborn's Declaration contains additional data regarding Plaintiff's billable hours from 2014-2016, among other things. Despite this mischaracterization, the Court finds that this evidence is necessary to conduct an adequate *de novo* review of the benefit decision.

Under Plaintiff's long term disability policy, the definition of "disability" includes consideration of Plaintiff's loss in monthly earnings due to the alleged sickness

or injury. As knowledge of Plaintiff's income is necessary to determine whether he meets the definition of "disabled" pursuant to his long term disability policy, Defendants' Motion to Strike Mr. Osborn's Declaration is **DENIED**. Dkt. # 45. The Court notes that Mr. Osborn's Declaration contains several statements that are not relevant to this consideration or are otherwise cumulative. Therefore, only statements and other information relevant to Plaintiff's alleged loss in income will be considered for the purposes of determining whether Plaintiff meets the requirements of his insurance policies.

Plaintiff also submitted a physical capacity evaluation report from Becker. In the accompanying declaration, Plaintiff's counsel represents that this report is dated March 12, 2015. Dkt. # 46 at 3. The submitted report is dated June 6, 2017. Dkt. # 46 Ex. 1. This date is over one year after this lawsuit was filed and almost two years after Defendants' denied Plaintiff's appeal of his claims. This report was not part of the administrative record and will not be considered by the Court for the purpose of these Motions. Defendants' Motion is **GRANTED** as to this report. Dkt. # 46 Ex. 1.

### III. FINDINGS OF FACT

1. Plaintiff Patrick J. Mullaney asserted claims for disability benefits under two policies: an individual policy underwritten by Defendant Paul Revere Life Insurance Company of America ("Paul Revere"), and a group policy underwritten by Defendant UNUM Life Insurance Company of America ("UNUM"). LTD-000003. Paul Revere was acquired by UNUM. Both plans and Plaintiffs' claims herein are governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1001 *et seq*. Dkt. # 1 (Complaint).

2. The claim period at issue in this case is January 1, 2011, when Plaintiff alleges his symptoms began, through February 22, 2016, the date he filed this case.

3. Plaintiff was born in 1961. He has worked as an attorney at Foster Pepper PLLC, a law firm, since 1997. He became a partner of the law firm in 2002. At some

point he became an equity partner. On January 1, 2014, Plaintiff became an "income member" and was no longer an equity partner. LTD-000068-69. One year after becoming an "income member," Foster Pepper began compensating Plaintiff at an hourly rate. Dkt. # 45.

4.  As a land use litigation attorney, Plaintiff is frequently required to attend court hearings or participate in other litigation-related activities. His practice includes managing the structuring of real estate deals, utilizing scientific experts, and dealing with technical information in order to ensure the feasibility of property or land development under existing law. Plaintiff is also required to negotiate with various governmental agencies and resolve land rights disputes. LTD-296-230; LTD-1660.

5.  Foster Pepper's compensation system is based on a three-year average of performance. An attorney's compensation for a calendar year is based on his or her performance in the three previous years. An attorney may also receive a bonus based on his performance the previous year. Dkt. # 45. Plaintiff's budgeted compensation for 2011 was $220,000. He received $284,812 in compensation that year. Plaintiff's budgeted compensation for 2012 was $225,000. Plaintiff received $236,449 in compensation in 2012. In 2013, Plaintiff's budgeted compensation was $225,000. He received $210,000 in compensation for that year. Plaintiff's budgeted compensation for 2014 was $140,000. He received $134,000 in compensation in 2014. LTD-310; Dkt. # 21 at 2. Plaintiff provides no information regarding his budgeted compensation for 2015 and 2016. Plaintiff's compensation for 2015 and 2016 was $146,000 and $104,642.33, respectively. Dkt. # 45 Ex. A.

6.  Plaintiff first began experiencing muscle pain in January of 2011. LTD-000151. On February 10, 2011, Plaintiff saw Dr. Smith, complaining of sinus symptoms and swollen glands. IDI-431. Dr. Smith diagnosed Plaintiff with sinusitis and

insomnia and suggested he consult a sleep specialist. After this visit, Plaintiff went backcountry skiing and experienced pain in his left posterior shoulder and armpit. He was concerned he was having a heart attack but a cardiology visit ruled this out. IDI-484.

7. Plaintiff saw Dr. Smith two more times in February of 2011. Once on February 17, 2011, complaining of left axillary pain down the side of his chest wall with minimal right bicep pain. Dr. Smith noted in his report that the pain was "[p]robably not cardiac pain" but due to a previous indication of some areas of disease on Plaintiff's CT angiogram, he felt that a "stress echo test would be prudent." IDI-430. Plaintiff saw Dr. Smith again on February 25, 2011 due to continued pain in his left axilla which he described as a burning-type of skin sensation along the lateral chest wall and sometimes on his right chest. Plaintiff also complained of occasional achiness in his neck. He noted that the symptoms tended to wax and wane and had been going on since February 10, 2011. Dr. Smith decided to expand Plaintiff's metabolic workup to look for any cause of paresthesias, dysesthesias, or muscle inflammation. IDI-429.

8. On March 10, 2011, Plaintiff went to see Dr. Smith again. He reported having numbness down his middle two fingers in his right hand, and continued chest wall pain. Dr. Smith's assessment was that it was cervical radiculopathy and referred Plaintiff to University of Washington for further assessment. IDI-428.

9. Plaintiff saw Dr. Shu-Ching Ho at the University of Washington in March of 2011. He described a "deep aching pain, like 'lactic acid building up' in his muscles," mostly in his arms under his armpits and in his calves. He also reported feeling numbness and tingling mostly in his fingers but that these symptoms had disappeared after several weeks. His diagnostic workup at that time was "unremarkable" and his neurological examination was normal. IDI-489.

10.      On April 7, 2011, Plaintiff saw Dr. Smith for a sore throat but mentioned that his muscle pain had worsened after early March and that he had seen a neurologist who told him that it might be a viral muscular response to some viral syndrome that would slowly go away. At the time, Plaintiff reported that he had gradually started improving the week before. IDI-426

11.      Plaintiff next saw Dr. Smith on May 25, 2011 due to continued muscle pain. He requested that that his bloodwork be redone and a Lyme's titer because he felt the symptoms had begun after his travel in Arizona. IDI-423. Dr. Smith assessed muscle pain, prediabetes, and recommended a colon cancer screening. *Id.*

12.      On June 8, 2011, Plaintiff saw Dr. Smith to have a tick on his back removed. The medical report does not mention any muscle pain and indicated that his Lyme's titer was still pending. IDI-422

13.      Plaintiff saw Dr. Hu again on June 24, 2011. Plaintiff noted that his pain had slightly improved with medication and that his finger numbness had disappeared. At that time Plaintiff's pain was mostly in his legs, "in the attachment of the muscles to the bones." Plaintiff had no muscle weakness and his neurological examination was normal. Dr. Hu referred Plaintiff to a neuromuscular specialist for a second opinion. IDI-489.

14.      On July 11, 2011, Plaintiff was seen by Dr. Dina Thyerlei at the University of Washington pain clinic for a neuromuscular evaluation. Plaintiff described his paid as "diffuse bee stings in his triceps." Dr. Thyerlei's report also notes that "[s]ome of his providers are wondering, if he could have fibromyalgia." Plaintiff's neurological exam showed that he had "no focal weakness or fatiguable weakness, numbness or positive fibromyalgia trigger points." Plaintiff showed no worsening of symptoms with exertion. Dr. Thyerlei concluded that "[f]ibromyalgia seems less likely without positive trigger points." IDI-1641-43.

15. On July 25, 2011, Plaintiff was examined by Lynn Schaefer-Alfonse, ARNP and Dr. Philip Mease of Seattle Rheumatology Associates, PLLC. Plaintiff's neurovascular exam showed intact cranial nerves. Plaintiff's sensation and reflexes were normal and showed extremity strength of 5/5 in all extremities. Plaintiff's fibromyalgia tender points were not tender, however Plaintiff exhibited tenderness over the lateral epicondyles bilaterally, triceps bilaterally, as well as his in his calves and in the arches of his feet. The report indicates that "[w]e are doubtful that this is fibromyalgia as he has no major tender points." IDI-1467.

16. Plaintiff returned to see Dr. Thyerlei on August 9, 2011 in order to rule out myopathy. Plaintiff reported pain in his calves and thighs that improved with exercise and occasional calf cramping. The results of the nerve conduction studies and EMG studies showed possible mild chronic right S1 or S2 radiculopathy, but no evidence of myopathy or significant sensory neuropathy. IDI-481.

17. On September 30, 2011, Plaintiff returned to Dr. Smith for a follow-up evaluation. Dr. Smith noted that Plaintiff was taking Cymbalta with a "tentative diagnosis of fibromyalgia since all his muscle studies and nerve conduction studies were normal." IDI-420.

18. In the Fall and Winter of 2011, Plaintiff returned to Seattle Rheumatology Associates, PLLC, three times. On September 20, 2011, Plaintiff saw Schaefer-Alfonse, and reported that he was feeling much better, but continued to have pain in his muscles similar to moving muscles after a "bee sting" or a burning sensation whenever he used his muscles. He reported that the areas most affected by this pain were his calves, forearms, chest and palms, and that he had "very sensitive spots" that hurt when pushed. The report notes that Plaintiff's symptoms "did not appear to be consistent with fibromyalgia." On October 18, 2011, Plaintiff reported a 70% decrease in muscle pain after taking Cymbalta for four weeks. Schaefer-Alfonse noted that Plaintiff had no tender fibromyalgia points. Plaintiff

saw Schaefer-Alfonse again on December 20, 2011.  He reported a 70% decrease in pain with Cymbalta.  The report notes that he was able to ski and hike again. IDI-1462-64.

19.     Plaintiff was also assessed by Phalla Kith, PA, and Dr. William Thomas Edwards at the University of Washington Medical Center's Chronic Pain Clinic on November 28, 2011 and January 20, 2012.  Plaintiff reported to Kith that he was feeling fatigued due to pain and interrupted sleep.  Kith noted that Plaintiff "had a lot of sleeping problems in the past," and that he suffered from "moderate obstructive sleep apnea."  Kith's assessment noted fibromyalgia, sleep apnea, and hypertension.  Kith also recommended that Plaintiff continue to take Cymbalta. Dkt. # 49 Ex. 1.  In January of 2012, Plaintiff returned to the pain clinic and was examined by Dr. Edwards.  Plaintiff reported that his pain level was at a 3/10, and that he had found that taking Cymbalta was helpful.  Dr. Edwards stated that Plaintiff had "met diagnostic criteria on physical examination for fibromyalgia, with 11 of 18 standardized tender points positive."  Dr. Edwards also noted that Plaintiff's fatigue was likely related to the fibromyalgia in combination with a "disturbed sleep pattern," and that he did not believe that Plaintiff had chronic fatigue syndrome.  Dr. Edwards recommended that Plaintiff regularly engage in exercise and that he see a cognitive behavioral therapist for "evaluation of the role of cognitive behavioral therapy and systemic relaxation and stress reduction." Dkt. # 49 Ex. 2.

20.     In June of 2012, Plaintiff returned to see Dr. Smith for a follow-up evaluation of "hypertension, hyperlipidemia, fibromyalgia."  Plaintiff told Dr. Smith that he was doing better "in general" but he was "still not great."  Dr. Smith noted that Plaintiff's labs suggested adrenal insufficiency and that he was working with the pain clinic at the University of Washington with the "fibromyalgia doctors there." IDI-419.

21.    Plaintiff's next two visits to Seattle Rheumatology Associates, PLLC were on October 31, 2012 and November 28, 2012. Plaintiff again reported a good response to Cymbalta. Plaintiff's November medical report notes that he was getting better sleep and was able to do more exercise. Plaintiff also reported that his medication had "really reduced the pressure point pain," and that "his muscles felt more relaxed." IDI-1460-62.

22.    In 2013, Plaintiff's fibromyalgia symptoms appeared to improve somewhat. In February of 2013, Plaintiff reported he had "virtually eliminated any of his fibromyalgia symptoms." Over the summer, he noted that his fibromyalgia had been "a little more active" and in September of 2013, he stated that he had good days and bad days. IDI-416-17; IDI-1459.

23.    Plaintiff filed a claim for disability benefits under his individual policy with Paul Revere on December 26, 2013 ("IDI policy"). IDI-31-37. In his application, Plaintiff stated that his illness had impacted his stamina and mental acuity, and that he was unable to work at the pace and hours that he could prior to his illness. Plaintiff also stated that he worked 45 hours a week as a land use litigation attorney. *Id*.

24.    Plaintiff submitted an Attending Physician Statement, filled out by Schaefer-Alfonse, which lists a primary diagnosis of fibromyalgia, and states that Plaintiff was "able to work – all duties but reduced work schedule (approximately half-time)." IDI-172. She also stated that "[he] can do all activities needed to function at his job but needs reduced work hours as long hours increase pain and fatigue." IDI-173.

25.    On March 20, 2014, Defendants[1] conducted an interview with Plaintiff to obtain additional details about his condition. Plaintiff stated that he did not file a claim

---

[1] Plaintiff filed his initial claim for benefits with Paul Revere, however, as Paul Revere was acquired by UNUM, the Court will reference both Defendants when discussing the review and appeal of both of Plaintiff's claims.

for disability until 2013 because it took all of 2011 to determine a proper diagnosis for his condition, his own reluctance to admit that he was disabled, and his hope that treatment and prescription medicine would alleviate his symptoms. Plaintiff also stated that he did not experience a loss of earnings until 2012, when he no longer qualified for a bonus. Plaintiff noted that his work hours had decreased from 50-60 hours per week to an average of 30 hours per week. LTD-293-304.

26. On March 24, 2014, Deborah Donahue, R.N. conducted an initial review of Plaintiff's medical records. She stated that the Attending Physician Statement was not supported because there was no "definitive diagnosis" and reports of activities that would be in excess of those of an individual with chronic pain and fatigue. She also noted that not all of Plaintiff's providers had found evidence of fibromyalgia. IDI-517.

27. After Donahue's review, Plaintiff's claim file was referred to Norman Bress, M.D. Dr. Bress is board certified in Internal Medicine and Rheumatology. Dr. Bress contacted Schaefer-Alfonse on April 11, 2014. Dr. Bress' notes from their conversation indicate that Schaefer-Alfonse did not place any restrictions on Plaintiff's activities and that any impairment was based on Plaintiff's report of fatigue after working a long day. IDI-558-559. Dr. Bress also contacted Dr. Smith. Dr. Bress reported that Dr. Smith stated that he would "not be surprised" if Plaintiff would not be able to work full time because of symptoms of fatigue as a result of fibromyalgia, but had not performed a complete physical exam of Plaintiff during the year prior to their conversation and could not comment on Plaintiff's functionality at that time. IDI-699-700.

28. Defendants then asked John Paty, M.D., FACP, FACR, to review Plaintiff's claim and determine whether Plaintiff's medical records supported Schaefer-Alfonse's opinion or Dr. Smith's opinion. Dr. Paty is also a board certified Rheumatologist. Dr. Paty determined that Plaintiff's medical records supported a diagnosis of

fibromyalgia, but did not support a finding of arthritis, synovitis, or neurological or cognitive physical abnormalities. Dr. Paty opined that Plaintiff's medical records did not support a finding of impairment due to pain or fatigue within "a reasonable degree of medical certainty." IDI-703-707.

29. Defendants denied Plaintiff's claim on May 30, 2014, because it determined that Plaintiff was not disabled according to the terms of his disability policy. IDI-729. Defendants concluded that the documentation in Plaintiff's claim file did not provide support for restrictions or limitations that would have prevented him from working on a full-time basis. IDI-730.

30. Plaintiff appealed the denial of his claim on June 9, 2014. IDI-742. Plaintiff requested a copy of his claim file and indicated that he would provide a more detailed statement of appeal after receiving it. *Id.* Plaintiff's appeal was assigned to Linda Doyle. IDI-746. During the appeal review, Defendants discovered that Plaintiff was potentially eligible for benefits under a group insurance policy with UNUM in addition to his individual policy with Paul Revere ("IDI claim"). Defendants advised Plaintiff of this and opened up a new claim under his group policy ("LTD claim") in addition to Plaintiff's ongoing IDI claim. IDI-761.

31. Defendants followed up with Plaintiff regarding his intention to submit additional information for his appeal on several occasions in July, August, and October of 2014. Plaintiff did not submit any new information during that time. IDI-768, 774, 780, 784-790.

32. While Plaintiff's appeal was ongoing, he returned to see Dr. Smith for a physical exam and to Seattle Rheumatology on two occasions. Dr. Smith's report states, "neuropsychiatric – for fatigue and had several years ago." IDI-1487. On August 4, 2014, Plaintiff reported "lots of pain" in his arms and legs, as well as bilateral foot neuropathy. He had decreased his medication due to its side effects. IDI-1419. On November 5, 2014, Plaintiff reported that he was attempting to be active

and was working out.  He reported that he felt a "bee sting" sensation when he stressed his muscles.  IDI-1414.

33.    Defendants denied Plaintiff's appeal on November 12, 2014.  IDI-1596.  The denial letter stated that the "LTD plan's definition of disability is essentially the same as the IDI policy's.  Consequently, the decision on the LTD claim parallels the IDI decision."  Defendants found that Plaintiff did not meet the definition of "disabled" under the terms of the LTD policy.  As Plaintiff did not submit any additional information, Defendants based this decision on the same information used to make its decision on Plaintiff's IDI claim.  IDI-1595-1599.

34.    On November 25, 2014, Plaintiff contacted Defendants and requested an extension to submit more information for his appeal.  Defendants gave him until November 30, 2014 to do so.  IDI-798.  Plaintiff then retained an attorney and asked for another extension.  IDI-800.  Defendants denied Plaintiff's request on December 4, 2015.  IDI-811-812.

35.    Defendants then had Andrew Krouskop, M.D., review Plaintiff's claim file.  Dr. Krouskop is board certified in Physical Medicine and Rehabilitation.  IDI-813-817.  Dr. Krouskop concluded that Plaintiff's cognitive complaints were not substantiated by any testing and that the suggested restrictions were not supported.  IDI-1816.

36.    Defendants denied Plaintiff's appeal on December 17, 2014.  The letter stated that the reviewing physician concluded that Plaintiff's medical condition did not limit his ability to perform the "important duties of your occupation."  IDI-822.

37.    On January 6, 2015, Plaintiff retained the services of his current counsel in this case to assist with his appeal.  After which, Plaintiff underwent cognitive testing and a physical capacity evaluation.  Glen Goodwin, Ph.D., a neuropsychologist, conducted Plaintiff's cognitive testing.  Plaintiff's cognitive testing showed that "[h]e appeared to have adequate attention and concentration on tasks and

demonstrated low distractibility.  He reported no change in ability to focus during the examination."  Goodwin noted that Plaintiff's test results showed "evidence of significant weakness below predicted levels in processing speed, delayed memory processing and on a number of problem solving tasks dependent on speed."  The report also noted that Plaintiff demonstrated good stamina during testing and requested few breaks.  He reported signs of fatigue and appeared "particularly tired" at the conclusion of both testing days.  IDI-1300-1316.

38.  Plaintiff's physical capacity evaluation was conducted by Theodore Becker, Ph.D.  Becker found that Plaintiff's "physiological profiles show that [Plaintiff] has a significant positive finding of physiological fatigue which will be disruptive of executive, administrative and cognitive processes."  IDI-913.  Becker concluded that there was a positive finding of physiological fatigue "which is a profile that indicates disruption in day to day affairs and general cognition."  IDI-951.

39.  On May 11, 2015, Plaintiff's counsel submitted a letter and additional information as a "partial appeal" of Defendants' denial of Plaintiff's LTD claim.  The letter also requested that review of Plaintiff's appeal be "tolled" for 45 days.  IDI-885.  Defendants granted the request.  LTD-796.

40.  On July 20, 2015, Plaintiff was assessed by Donald Uslan, M.A., a rehabilitation counselor.  In his report, Uslan gave his vocational rehabilitation opinion of Plaintiff's condition, stating that it was his opinion that Plaintiff is completely disabled "on a more-probably-than-not basis."  Uslan also stated that Plaintiff "is completely and totally disabled from all employment, be it full- or part-time, in all exertional levels of employment and has been so since November 2011."  LTD-1612.

41.  After Plaintiff submitted his additional information, Defendants had Beth Schnarrs, M.D., review Plaintiff's entire file.  Dr. Schnarrs is board certified in Internal Medicine.  LTD 2315-2320.  Based on her review, Dr. Schnarrs

concluded that Plaintiff's medical records did not support restrictions or limitations for his employment from January of 2011 forward. Dr. Schnarrs determined that Plaintiff did not suffer from a medical condition or combination of medical conditions that would support limiting his work capacity. LTD-2315-2320.

42.   Defendants had Plaintiff's neuropsychological testing and raw test data ("RTD") examined by Jana Zimmerman, Ph.D., a licensed psychologist. Zimmerman noted that Plaintiff's test results were valid, but did not support cognitive impairment. LTD-2361. Finding that Plaintiff's test results fell within normal limits, Zimmerman concluded that "personality testing suggested psychological contribution to perceived somatic/cognitive complaints as well as possible substance-related issues." LTD-2360-2361.

43.   Pursuant to Zimmerman's report, Defendants referred Plaintiff's medical records to Peter Brown, M.D. for evaluation for a behavioral health condition. Dr. Brown is board certified in Psychiatry. LTD-2364-2366. Dr. Brown found that there was no evidence or assertion of restrictions or limitations due to a behavioral health condition, and that Plaintiff's mental status examinations, neuropsychological testing, and multispecialty treatment records do not establish any psychiatric diagnosis or report evidence of any related impairment in functional capacity. *Id.* Dr. Brown also concluded that from a "whole person perspective," restrictions and limitations are not supported for cognitive impairment due to any of Plaintiff's diagnoses or combination of diagnoses. *Id.*

44.   Defendants also had Richard Byard, JD, MS, CRC, review Uslan's vocational rehabilitation opinion. Byard is a vocational specialist. Byard noted that in coming to his conclusion, Uslan accepted the conclusions of Dr. Becker, Dr. Goodwin, Dr. Smith, and statements made by Plaintiff, Plaintiff's family members, and Plaintiff's work colleagues. Noting the difference between these

conclusions and those of the other reviewers on appeal, "it is reasonable to expect widely divergent vocational opinions." LTD-2367-2370.

45. On October 30, 2015, Defendants denied Mullaney's appeal of his LTD and IDI claims. IDI-1744-1750. Defendants concluded that Plaintiff was able to perform the duties of his occupation and did not meet the definitions of disability under his insurance policies. *Id.*

46. Plaintiff then filed complaint against Defendants with Washington Office of the Insurance Commissioner. IDI-1754. On January 29, 2016, Defendants responded to Plaintiff's Insurance Fair Conduct Act notice. IDI-1761. On February 22, 2016, Plaintiff filed this claim. Dkt. # 1.

47. Under the IDI Policy, Defendants defined "Total Disability" as:

> "Total Disability" means that because of injury or sickness:
> a. [The insured is] unable to perform the important duties of [the occupation or occupations in which the insured is regularly engaged at the time disability begins]; and
> b. [The insured is] receiving a physician's care. [Defendants] will waive this requirement if [Defendants] receive written proof acceptable to [Defendants] that further physician's care would be of no benefit to [the insured].

IDI-146.

48. Under the IDI Policy, Defendants defined "Residual Disability" as:

> "Residual Disability", prior to the [date on which benefits begin during a disability], means that due to injury or sickness which begins prior to age 65:
> a. (1) [The insured is] unable to perform one or more of the important duties of [the occupation or occupations in which the insured is regularly engaged at the time disability begins]; or
> (2) [The insured is] unable to perform the important duties of [the occupation or occupations in which the insured is regularly engaged at the time disability begins] for more than 80% of the time normally required to perform; and
> b. [The insured is] receiving a physician's care; and
> c. [The insured is] not totally disabled.

IDI-147.

49.     Under the LTD Policy, [the insured] is disabled when Defendants determine that:

       a.    [The insured is] limited from performing the Material and Substantial Duties of [the insured's] regular occupation due to [the insured's] sickness or injury; and

       b.    [The insured has] a 20% or more loss in [the insured's] indexed monthly earnings due to the same sickness or injury.

LTD-473.

50.     Under the LTD Policy, "Material and Substantial Duties" are duties that:

       a.    Are normally required for the performance of [the insured's] regular occupation; and

       b.    Cannot be reasonably omitted or modified.

LTD-490.

51.     The Court had the opportunity to review records from Plaintiff's treating physicians and other medical professionals, Plaintiff's experts, Defendants' reviewing physicians, and other relevant documents from the record. The Court finds Plaintiff, Plaintiff's treating physicians, and Plaintiff's treating medical professionals to be credible.

52.     The Court also finds Goodwin and Becker to be credible witnesses. Defendants question the credibility of Goodwin and Becker because they have been hired by Plaintiff's counsel on prior occasions to provide medical opinions. This fact alone is insufficient to determine that Goodwin and Becker are not credible. All of Defendants' reviewing physicians are similarly hired by Defendants to provide review of medical records or to provide medical opinions. The Court is also not persuaded by Defendants' contention that Becker's testing methodology is not commonly accepted. Becker references scientific articles and studies in support of

his report and provides similar studies to state agencies, corporations, and long-term disability carriers.  Defendants provide no other persuasive argument that Becker's opinion is not credible.  LTD-00800; IDI-913-951.

53.   The Court does not find Uslan's opinion to be credible.  Uslan opined that Plaintiff is "completely and totally disabled from all employment, be it full or part-time, in all exertional levels of employment and has been so since November 2011."  LTD-1612.  This opinion is not supported or echoed by any other medical record, expert, physician, or medical professional on the record.  While Plaintiff has not worked full-time for all of the period at issue, he has worked and continues to work for part of the time.  This does not support a finding of "complete and total disability".

## IV.   CONCLUSIONS OF LAW

### A.  Standard under ERISA

ERISA provides that a qualifying ERISA plan "participant" may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"  29 U.S.C. § 1132(a)(1)(B); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court.").

As discussed above, ERISA does not set forth the appropriate standard of review for actions challenging benefit eligibility determinations.  *Firestone*, 489 U.S. at 109.  The parties, however, have agreed that *de novo* review is appropriate here.  The Court accepts the parties' stipulation and reviews the record *de novo*.  *See Rorabaugh*, 321 F. App'x at 709 (court may accept parties stipulation to *de novo* review).  "When conducting a *de novo* review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan."  *Muniz*

*v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010). The administrator's "evaluation of the evidence is not accorded any deference or presumption of correctness." *Perryman v Provident Life & Acc. Ins. Co.*, 690 F. Supp. 2d 917, 942 (D. Ariz. 2010). In reviewing the administrative record and other admissible evidence, the Court "evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate." *Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 12 F. Supp. 3d 1237, 1251 (N.D. Cal. 2014) (quoting *Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program,* 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010)).

When a district court "reviews a plan administrator's decision under the *de novo* standard of review, the burden of proof is placed on the claimant." *Muniz*, 623 F.3d at 1294; *see also Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (the claimant "bears the burden of proving his entitlement to contractual benefits"). However, this does not relieve the plan administrator from its duty to engage in a "meaningful dialogue" with the claimant about his claim. *See Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) ("[W]hat [29 C.F.R. § 2560.503-1(g)] calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. . . . [I]f the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it.").

B. Residual Disability

"[F]ibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective . . . . Objective tests are administered to rule out other diseases, but do not establish the presence or absence of fibromyalgia." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004), *overruled on other grounds by Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 969 (9th Cir. 2006). The Ninth Circuit has held that "the lack of objective physical findings" is insufficient to justify denial of disability benefits. *Salomaa v.*

*Honda Long Term Disability Plan*, 642 F.3d 666, 669 (9th Cir. 2011). A disability plan's reliance on normal diagnostic or clinical results in the face of credible evidence suggesting impairment due to fibromyalgia or chronic fatigue is an abuse of discretion. *Salomaa*, 642 F.3d at 676.

Defendants argue that Plaintiff failed to demonstrate that he meets the definition of "residually disabled" pursuant to either his LTD policy or his IDI policy. Under Plaintiff's IDI policy, the insured qualifies as residually disabled if he is receiving a physician's care, and is either unable to perform one or more of the important duties of his occupation, or unable to perform the important duties of his occupation for more than 80% of the time normally required to perform them. Under Plaintiff's LTD policy, the insured qualifies as "disabled" if he is limited from performing the "Material and Substantial" duties of his occupation due to his sickness or injury and has a 20% or more loss in his monthly earnings due to that sickness or injury. "Material and Substantial" duties are defined as duties that are normally required for the performance of the insured's occupation and cannot be reasonably omitted or modified.

The Court made findings of fact based on the underlying administrative record as supplemented by Plaintiff's additional documents. Based on those findings, the Court holds that Plaintiff carried his burden to show, by a preponderance of the evidence, that he meets the definitions of "residually disabled" and "disabled" pursuant to his IDI and LTD policies, respectively. Defendants argue in both their Motion and Response to Plaintiff's Motion that Plaintiff does not meet the relevant definitions because his symptoms have not been consistent over the claim period and has not always met the diagnostic criteria for fibromyalgia. This argument is unpersuasive. Plaintiff was diagnosed with fibromyalgia in 2011. A review of his records indicates that Plaintiff had periods where his pain and fatigue were improved through medication and other treatments, and periods where his symptoms worsened. This is consistent with the nature

of fibromyalgia; the symptoms can be worse at some times more than others.  *See Jordan*, 370 F.3d at 872; LTD-1593.

Defendants contend that an objective review of the available medical records indicate that Plaintiff is not disabled, noting that Plaintiff's claim file was reviewed by five of their physicians.  However, not one of Defendants' reviewing physicians examined Plaintiff, nor did Defendant engage any independent physicians to examine him.  Defendants argue that Supreme Court law rejects the contention that the opinions of treating physicians should be accorded greater weight, citing to *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), which held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  However, this rule is applicable to a district court's review under the "abuse of discretion standard," not the *de novo* review requested by the parties in this case.  When conducting a *de novo* review of the record, the Court is determining whether "the claimant has adequately established that he or she is disabled under the terms of the plan," not whether the plan administrator credited Plaintiff's medical records accurately.  *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010).  Setting aside the argument whether the opinions of Plaintiff's treating physicians should be given more weight, merely relying on the number of opinions supporting each party's argument is not appropriate where the Court's role is to "[evaluate] the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate."  Therefore, a mere objective review of Plaintiff's medical record is not persuasive.

Plaintiff argues that he meets the definitions of "residually disabled" and "disabled" under his policies because the important duties of his occupation include "long hours, and cognitive and physical stamina, which [Plaintiff] does not possess to work

full-time." Dkt. # 42. It is clear from the record that having cognitive and physical stamina qualifies as an important or material and substantial duty of Plaintiff's occupation as a land use litigation attorney at a law firm. Plaintiff's occupation requires the ability to analyze scientific and technical information, develop legal strategy, engage in negotiations, draft documents, appear in court hearings, and engage in other litigation. All of these activities require cognitive stamina.

Several of the medical reports on the record indicate that Plaintiff suffers from fatigue and that this fatigue is disruptive of his cognitive processes. Plaintiff's cognitive test results showed "evidence of significant weakness below predicted levels in processing speed, delayed memory processing and on a number of problem solving tasks dependent on speed," and "physiological fatigue which will be disruptive of executive, administrative, and cognitive processes." IDI 1300-1316; IDI-913. During testing, Plaintiff reported feeling "foggy and tired" and reported being unable to concentrate for longer than four to five hours a day, if at all. LTD-815; LTD-1207-1208. While Defendants emphasize that Plaintiff's neurological examinations did not show objective evidence of myopathy or significant sensory neuropathy and that Plaintiff's treating medical professional, Schaefer-Alfonse, indicated that Plaintiff was able to engage in all of the activities needed to function at his job, these conclusions did not include an assessment of how prolonged pain and fatigue affects Plaintiff's ability to engage in those activities or his cognitive stamina. IDI-172-173. Further, Schaefer-Alfonse did state that Plaintiff needed to work reduced hours because long hours increase his pain and fatigue. *Id*. This assessment was supported by Dr. Mease, the physician overseeing Schaefer-Alfonse. LTD-1592. Dr. Mease indicated that cognitive fatigue, or dyscognition, is a typical symptom of fibromyalgia patients. LTD-1593-1594.

Plaintiff's work history also supports his contention that he is unable to work full-time due to his medical condition. Plaintiff began reducing his hours at work after he began experiencing symptoms and eventually left his position as an equity partner at

Foster Pepper and became an "income member". One year after Plaintiff became an "income member," his status was then further reduced and Foster Pepper began compensating him at an hourly rate. Dkt. # 45. Defendants' contention that Plaintiff's physical activities are inconsistent with disability from chronic pain and fatigue is also unpersuasive. Plaintiff does not allege that he is unable to engage in activities of daily living, exercise, or travel. The fact that Plaintiff is able to engage in these activities does not undercut his contention that he lacks physical and cognitive stamina. Plaintiff is not alleging that he is totally disabled and is not attempting to qualify for such benefits.

C. Loss of Income

Defendants contend that both of Plaintiff's insurance policies require a loss of earnings before benefits are payable. With regards to Plaintiff's IDI policy, loss of earnings factor in Defendants' determination of the amount payable to the insured pursuant to his or her residual disability benefits. IDI-148. However, if Plaintiff cannot demonstrate a loss in earnings, he will not receive any residual benefit payments. Under Plaintiff's LTD policy, Plaintiff must show a 20% or more loss in his monthly earnings due to his sickness or injury to qualify as "disabled" under his LTD policy.

Plaintiff does not meet his burden to show that he suffered a sufficient loss in earnings from 2011-2013 to qualify as "disabled" under his LTD policy. Plaintiff reports no reduction in earnings in 2011. IDI-524. Plaintiff received more than his budgeted compensation in 2012, and more than 90% of his budgeted compensation in 2013. LTD-310. While this decrease in earnings in 2013 could be attributable to a decrease in Plaintiff's billable hours in 2012, this limited decrease does not meet the requirements of his LTD policy.

Plaintiff alleges that the billable hours provided in Mr. Osborn's Declaration (Dkt. # 45), prove that Plaintiff suffered a 20% loss in income. Plaintiff provides little support for this argument. Mr. Osborn's Declaration states:

Generally, between 70 and 80 percent of compensation is based on "working attorney" revenues (money received for an attorney's work) and the balance based on "originating" attorney revenues (money received as a consequence of a lawyer's relationship with a client, regardless of who does the work). If a member "out-performs" his compensation in a given year, Foster Pepper pays the member a bonus in the following year. Generally, the bonus reflects a lawyer's "profitability," determined by considering the member's revenues less the member's compensation and the per-member allocation of the firm's overhead.

Dkt. # 45. The Declaration states further that Plaintiff averaged 1,575 billable hours in 2010 and 2011, and had he continued to work 1,500 hours per year from 2012 through the present, his compensation would have risen to $325,000, with an additional increase in 2017. First, other than Mr. Osborn's declaration, Plaintiff provides no other documentation to support these statements. Plaintiff provides no other information regarding his billable hours prior to 2011. Second, Mr. Osborn states that Plaintiff's compensation was based on "working attorney" revenues and "originating" attorney revenues, but provides no specifics regarding the breakdown of Plaintiff's budgeted compensation per year. Plaintiff provides very little information regarding Plaintiff's "originating" attorney revenue, revenue that made up 20 to 30 percent of Plaintiff's compensation determination. Further, while Mr. Osborn notes that Plaintiff's bonus was $60,000 in 2011 for his work in 2010, Plaintiff provides no other information regarding his bonuses in other years beyond the bonus he received in 2015.

To the extent that Plaintiff contends that he experienced a loss in income in 2012 and 2013 due to the fact that he was no longer eligible for a bonus because of his decrease in billable hours, Plaintiff still fails to provide sufficient support for this contention. As noted above, Plaintiff provides little information regarding his bonuses. Plaintiff does not indicate what his bonuses were prior to 2011 to provide a basis for comparison, nor does he provide sufficient detail regarding how bonuses are determined. Other than the amount Plaintiff indicates was his budgeted compensation and the amount

of compensation Plaintiff actually received, Plaintiff offers very little other information on which the Court can determine what, if any, loss in earnings Plaintiff experienced in 2012 and 2013. Plaintiff fails to meet his burden of proof to show that Plaintiff experienced a sufficient loss in earnings to qualify as "disabled" pursuant to Plaintiff's LTD policy in 2012 and 2013.

Beginning on January 1, 2014, Plaintiff was no longer an equity partner. Plaintiff attributes this change to his inability to work the long hours required of an equity partner due to his pain and fatigue. Plaintiff's budgeted compensation dropped from $225,000 in 2013, to $140,000 in 2014. This constitutes a loss in earnings sufficient to meet the requirements of Plaintiff's LTD policy from 2014 through the end of the claim period.

Plaintiff has met his burden to show, by a preponderance of the evidence, that he meets the definition of "residually disabled" pursuant to his IDI policy, and that he meets the definition of "disabled" pursuant to his LTD policy from 2014 through the end of the claim period. Plaintiff's Motion is **GRANTED** as to Plaintiff's IDI policy, and as to Plaintiff's LTD policy beginning in 2014. Plaintiff's Motion is **DENIED** as to any benefits requested pursuant to his LTD policy from 2011 to 2013. Dkt. ## 21, 22.

## V.   CONCLUSION

Having reviewed the parties' Motions, Responses, and Defendants' Surreply, the Court hereby **FINDS** and **ORDERS**:

1) Defendants' Motion for Judgment under Federal Rule of Civil Procedure 52 is **DENIED.** Dkt. ## 30, 31. Plaintiff's Motion for Judgment under Federal Rule of Civil Procedure 52 is **GRANTED in part and DENIED in part**. Dkt. ## 21, 22.

2) Plaintiff's request for declaratory judgment to enforce Defendants' continuing obligation to him under his policies as well as attorney's fees and costs is **GRANTED.**

3) Defendants' Motion to Strike Exhibits 1 and 2 to Mr. Langer's Declaration (Dkt. ## 49, 50) and Mr. Osborn's Declaration (Dkt. # 45) is **DENIED.** Defendants'

Motion to Strike Plaintiff's Declaration (Dkt. # 44) and a physical capacity report issued by Theodore J. Becker, Ph.D (Dkt. # 23) is **GRANTED**.

4) Plaintiff's Motion to Seal is **GRANTED**. Dkt. # 41.

Dated this 6th day of July, 2018.

_____
The Honorable Richard A. Jones
United States District Judge